UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE QUIGLEY COMPANY, INC.

10 Civ. 1573 (RJH)

**MEMORANDUM OPINION AND ORDER**

Richard J. Holwell, District Judge:

Appellant Law Offices of Peter A. Angelos appeals from an order of the United States Bankruptcy Court for the Southern District of New York ("the Bankruptcy Court") determining that certain state law claims it wished to bring were prohibited by the amended channeling injunction put in place in this case. Appellant brought claims against Pfizer, Inc. ("Pfizer"), the parent company of debtor Quigley Company, Inc. ("Quigley"), in state court. Pfizer filed a motion in the Bankruptcy Court arguing that these claims were subject to the amended injunction. On May 15, 2008, the Bankruptcy Court issued a memorandum order and opinion clarifying the amended injunction ("BR Opinion") that held that Appellant's suits fell within the injunction and directed Appellant to cease prosecuting them. Appellant appeals that decision, arguing that the Bankruptcy Court did not have subject matter jurisdiction to enjoin its actions

1

and that its fell outside the scope of 11 U.S.C. § 524(g).  For the reasons stated below, the Bankruptcy Court's opinion is REVERSED.

## BACKGROUND

Quigley was founded in 1916 and produced refractories (materials that retain their strength at high temperatures).  (Def.'s Mem. 7.)  From the 1930s through the early 1970s, some of those products, including an insulation called Insulag, contained asbestos.  (*Id*.)  In August 1968, Pfizer acquired Quigley, which became Pfizer's wholly owned subsidiary.  (Pl.'s Mem. 3.)  Following the acquisition, marketing materials for several of Quigley's products, including Insulag, began to include the Pfizer name, logo, and trademark.  (*Id*.)  For example, an advertisement for Insulag contains the Pfizer logo followed by the Quigley logo over the words, "Manufacturers of Refractories—Insulation—Paints."  (RA 878.)  The Pfizer name and/or logo also appeared on bags of Insulag.  (Pl.'s Mem 3-4.)  Insulag was an insulation that could be used in high heat environments such as blast furnaces used in steel mills.  (*Id*. 4.)  Although it functioned well as an insulation, the asbestos it contained because dangerous when airborne because workers could inhale the fibers.  (*Id*.)  Once the fibers lodged in the lungs, they could cause fatal disease, including mesothelioma.  (*Id*.)  The Insulag packaging did not contain any warnings about the danger of asbestos.  (*Id*.)  To the contrary, Quigley marketing materials that also contained the Pfizer logo specifically marketed the product as safe, stating "Insulag . . . is not injurious contains no mineral oil or fine slag particles which are irritants to the body."  (*Id*.)

After the health effects of asbestos became known, many individuals began to file law suits against Quigley.  By the time Quigley filed for Chapter 11 bankruptcy, it was defending over 160,000 asbestos-related law suits and claims.  (BR Opinion 3.)  Over 100,000 of these suits also named Pfizer as a defendant although it is difficult to tell which of the claims against Pfizer

2

are based on its own products, certain of which contain asbestos, and which are based on Quigley's Insulag. (*Id.*) Quigley's principal asset is its interest in a joint insurance policy that it shares with Pfizer. (Def.'s Opp'n 7.)

When Quigley filed for bankruptcy in 2004, it petitioned the Bankruptcy Court for an injunction that would stop all asbestos-related lawsuits against itself and Pfizer. (*Id.*) The Bankruptcy Court (Beatty, J.) preliminarily enjoined all asbestos-related claims from proceeding against both companies (including those arising from Pfizer's own products) during the pendency of Quigley's bankruptcy proceeding. (*Id.*) In 2007, the Bankruptcy Court (Bernstein, J.) narrowed its earlier channeling injunction to permit certain direct actions against non-debtor Pfizer. The amended injunction afforded Pfizer with more limited protection against lawsuits, protection that tracks the language of 11 U.S.C. § 524(g)(A)(ii). (*Id.*) This provision is part of § 524(g), which enables bankruptcy courts to create asbestos litigation trusts that set aside money to pay out future asbestos claims. This statute also provides for injunctions of certain claims against certain non-debtors, including the parent companies of asbestos manufacturers such as Quigley. Tracking the statute, the Amended Injunction enjoined:

> any action directed against Pfizer alleging that Pfizer is *directly or indirectly liable for the conduct of*, claims against, or demands on Quigley *to the extent* such alleged liability of Pfizer *arises by reason of*—
>
> > (I) Pfizer's *ownership* of a financial interest in Quigley, a past or present affiliate of Quigley, or a predecessor in interest of Quigley;
> >
> > (II) Pfizer's involvement in the management of Quigley or a predecessor in interest of Quigley, or service as an officer, director or employee of Quigley or a related party;
> >
> > (III) Pfizer's provision of insurance to Quigley or a related party; or

3

>> (IV) Pfizer's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of Quigley or a related party, including but not limited to—
>
>>> (aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
>>>
>>> (bb) acquiring or selling a financial interest in an entity as part of such a transaction.

(*Id*. at 4 (emphasis added).)

Beginning in 1999, appellant commenced lawsuits in Pennsylvania on behalf of plaintiffs who had been exposed to asbestos-containing products sold by Quigley and Pfizer, including Insulag. (*Id*.) Appellant has named Pfizer as a defendant in Insulag-related claims under the theory that Pfizer, because it placed its logo on Insulag packaging and advertising, held itself out to consumers as a manufacturer of Insulag. (*Id*. at 5.) In doing so, appellant argues, Pfizer was an "apparent manufacturer" of Insulag and thus was liable pursuant to § 400 of the Second Restatement of Torts (*id*.), which the Pennsylvania courts have adopted as state law, *Forry v. Gulf Oil Corp.*, 237 A.2d 593, 599 (Pa. 1968). Section 400 of the Second Restatement of Torts provides: "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Restatement (Second) of Torts § 400 (1965). In 2008, appellant moved for partial summary judgment in many of these actions, and Pfizer in response moved in the Bankruptcy Court to enforce the Amended Injunction. (BR Opinion 5.)

The Bankruptcy Court held that appellant's Pennsylvania suits fell within the Amended Injunction. (*Id*.) The Bankruptcy Court framed the § 524(g) analysis in terms of three questions, all of which must be answered in the affirmative for the claims to be enjoined: "(1) does Pfizer's Section 400 liability arise directly or indirectly from the 'conduct of, claims against, or demands

on' Quigley; (2) will the Section 400 claims asserted by the Pennsylvania plaintiffs against Pfizer be paid under Quigley's plan; and (3) does Pfizer's liability 'arise by reason of' its ownership or management of Quigley?"  (BR Opinion 7-8.)  It answered the first two questions quickly in the affirmative.  (*Id*. at 9.)  It found that found that under a § 400 theory, Pfizer would be held directly or indirectly liable for the actions of Quigley because Quigley, not Pfizer, had manufactured the defective product.  It also found that these claims would be paid out under the Quigley plan because § 400 provides that an apparent manufacturer "is subject to the same liability as though he were its manufacturer."  (*Id.*)

It then devoted the majority of its analysis to answering the third question.  Noting that "at first glance," Pfizer's § 400 liability "arises by reason" of the placement of Pfizer's name and logo on the packaging of Insulag, the Bankruptcy Court concluded that the statutory text was vague because it could equally be said that Pfizer's § 400 liability arose by reason of its corporate affiliation with Quigley.  (*Id*. at 10.)  Finding that on the facts presented the use of the Pfizer name and logo were merely a "statement of corporate affiliation," the Bankruptcy Court concluded that Pfizer's § 400 liability arose from ownership of Quigley and fell within the ambit of § 524(g).  (*Id*. at 12)  Finally, it distinguished the Second Circuit's holding in *In re Johns-Manville*, 517 F.3d 52 (2d Cir. 2008) (hereinafter "*Manville III*")[1], wherein the court concluded that bankruptcy courts do not have subject matter jurisdiction to enjoin independents direct claims against non-debtors *Id.*, 517 F.3d at 66, ("[A] bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate.").  Here, the Bankruptcy Court found that the § 400 claims against Pfizer differed from the claims at issue

---

[1] The Court adopts the numeric used by the Second Circuit in *In re Johns-Manville*, 600 F.3d 135 (2d Cir. 2010) which is herein referred to as *Manville IV*.

in *Manville III* because they were not direct, non-derivative claims but were "vicarious and derivative" claims that could eventually affect the *res* of Quigley's bankruptcy estate.  (*Id.* at 14.)

## STANDARD OF REVIEW

"Pursuant to Bankruptcy Rule 8013, a District Court reviews a bankruptcy court's conclusions of law de novo and reviews findings of fact for clear error." *In re Cavalry Const., Inc.*, 428 B.R. 25, 29 (S.D.N.Y. 2010); *see also In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000) ("Like the District Court, we review the Bankruptcy Court's findings of fact for clear error, [and] its conclusions of law de novo . . . ." (internal citations omitted)).  Pfizer correctly points out that a bankruptcy court's interpretation of its own order, including the preliminary injunction at issue here, is typically given deference on appeal.  *Deep v. Copyright Creditors*, 122 F. App'x 530, 531 (2d Cir. 2004); *Casse v. Key Bank Nat'l Ass'n*, 198 F.3d 327, 333 (2d Cir. 1999).  Nonetheless, where, as here, the proper effect of an order hinges upon a question of statutory interpretation, this question is reviewed de novo.  *See Casse*, 198 F.3d at 334; *see also Kern v. TXO Production Corp.*, 738 F.2d 968, 970 (8th Cir. 1984) ("That is, when we say that a decision is discretionary, or that a district court has discretion to grant or deny a motion, we do not mean that the district court may do whatever pleases it. The phrase means instead that the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.").

## DISCUSSION

I.    **The Origins of the § 524(g) Channeling Injunction**

For years, courts and legislatures have struggled to craft just results for those who have been exposed to asbestos. Asbestos litigation poses unique challenges to bankruptcy courts because those who have been exposed to asbestos might not manifest symptoms of disease for forty years after exposure. *In re Johns-Manville Corp.*, 97 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) ("*Manville I*"). After the link between asbestos and respiratory disease became known, asbestos-producing companies became overwhelmed with lawsuits from disease-sufferers and often filed for bankruptcy. Bankruptcy courts were tasked with balancing the interests of those who were presently suffering from asbestos-related illness and those who might contract such illness in the future, but who had not yet manifested any symptoms of disease. *Id.*

The *Manville* bankruptcy court responded with an innovative solution: the asbestos litigation trust. Ronald Barliant et al., *From Free-Fall to Free-for-All: The Rise of Pre-Packaged Asbestos Bankruptcies*, 12 AM. BANKR. INST. L. REV. 441, 448 (2004). The court created an asbestos litigation trust funded by the debtor's assets and a portion of the reorganized company's future profits. This trust was to compensate not only asbestos claimants whose symptoms had already manifested, but also future claimants without signs of illness. *Id.* This remedy was uniquely attractive for asbestos producers because it, unlike a traditional class action lawsuit, could bind future claimants. *Id.* at 444. It was also a departure from traditional bankruptcies, which resolve only those claims existing at the time the debtor files for bankruptcy. *Id.*

Congress blessed this approach by enacting § 524(g), which was modeled after the Manville bankruptcy trust. *Id.* at 446. Pursuant to § 524(g), debtor companies can fund an

7

asbestos trust through Chapter 11 bankruptcy, and the courts will issue a channeling injunction that requires future claimants to direct their claims to the bankruptcy trust, rather than the debtor company. The payout to future claimants from these trusts tends to be small in comparison to the value of the claims, but at least future claimants receive something. *See* S. Todd Brown, *Section 524(g) without Compromise: Voting Rights and the Asbestos Bankruptcy Paradox*, 2008 COLUM. BUS. L. REV. 841, 852 (2008). In some instances, the channeling injunctions may also cover certain types of claims against third parties related to the debtor, such as the debtor's insurer or corporate affiliates, both of whom are within the ring of fire created by asbestos litigation. This case concerns such a third-party injunction.

>Section 524(g)(A)(ii) provides that a channeling injunction:
>
>may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be *directly or indirectly liable for the conduct of*, claims against, or demands on the debtor *to the extent* such alleged liability of such third party *arises by reason of*—
>
>>(I) the third party's *ownership* of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>>
>>(II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>>
>>(III) the third party's provision of insurance to the debtor or a related party; or
>>
>>(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—
>>
>>>(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
>>>
>>>(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

§ 524(g)(A)(ii) (emphasis added).

As noted, the bankruptcy court issued a channeling injunction in this case that tracks the language of § 524(g)(4)(A)(ii).

Courts are to interpret the reach of the § 524(g) channeling injunction for third parties narrowly, in accordance with the Second Circuit's observation that "a nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code." *Manville III*, 517 F.3d at 66 (quoting *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005)).

## II. Pennsylvania State Law

Appellant seeks to prosecute actions brought under §§ 400 and 402A of the Second Restatement of Torts, which the Pennsylvania courts have adopted as state law.[2] *Forry v. Gulf Oil Corp.*, 237 A.2d 593, 596-97, 599 (Pa. 1968). Section 400 of the Second Restatement of Torts provides: "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Restatement (Second) of Torts § 400 (1965). The *Forry* court, in adopting § 400, approved the reasoning of the Second Restatement, specifically that: "(a) the name and the trademark of the sponsor, plus the reputation of the sponsor, constitute an assurance to the user of the quality of the product, and (b) reliance (by the user) upon a belief that (the sponsor) has required (the product) to be made properly for him." *Forry*, 237 A.2d at 599 (quoting Restatement (Second) of Torts § 400 cmt. d) (internal citations and quotations omitted).

---

[2] Although it appears that appellant did not explicitly argue in the Bankruptcy Court proceeding that it intended to rely upon § 402A in pursuing its claims against Pfizer, its intentions are implicit in its reliance on § 400. Section 400 subjects apparent manufacturers to the "same liability" as actual manufacturers. Appellant relies upon § 402A to explain what that "same liability" would be.

This rule works in conjunction with Rule 402A. *Id*. § 402 cmt. a. Rule 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Id*. § 402A. Further, "[a] seller must give such warnings and instructions as are required to inform the user or consumer of the possible risks and inherent limitations of his product. If the product is defective absent such warnings, and the defect is a proximate cause of the plaintiff's injury, the seller is strictly liable without proof of negligence." *Walton v. Avco Corp.*, 610 A.2d 454, 458-59 (Pa. 1992) (quoting *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 902-03 (Pa. 1975)).

By the terms of § 400, a sponsor or apparent manufacturer is subject to the same type of liability as the actual manufacturer. In other words, where the manufacturer would be subject to strict liability pursuant to § 402A, a sponsor will be as well. *Brandimarti v. Caterpillar Tractor Co.*, 527 A.2d 134, 139-40 (Pa. Super. 1987). In the most common § 400 case, retailers are held liable for private label products that are manufactured by another party. *E.g.*, *Walton*, 610 A.2d at 459. However, Pennsylvania courts have also applied § 400 liability to a parent company such as Pfizer that neither sold, nor manufactured a product, but marked the product with its own name. *Brandimarti*, 527 A.2d at 139-40. ("Under such circumstances Caterpillar could expect others to purchase the product in reliance on the skill and reputation associated with the

10

Caterpillar name . . . and could be held strictly liable if the product bearing the Caterpillar name proved defective . . . .")[3]

## III. Application to the Instant Case

For a third-party action to be enjoinable under § 524(g), the action must have two characteristics: (1) the action must allege that Pfizer is "directly or indirectly liable" for the conduct of Quigley; and (2) the action must "arise by reason of" Pfizer's ownership of Quigley.

The Bankruptcy Court concluded that appellant's § 400 claims sought to hold Pfizer "directly or indirectly" liable for the conduct of Quigley. Determining whether this element has been satisfied is not without difficulty, especially in the context of strict products liability, where both manufacturers and sponsors are held liable regardless of whether they acted negligently. In one sense, these suits would hold Pfizer directly liable for its own conduct for endorsing a defective product. But the suits would also hold Pfizer indirectly liable for the conduct of Quigley in the sense that Quigley actually manufactured the defective product. The statute itself does not define the parameters of indirect liability. The Bankruptcy Court applied a "but for" standard, pointing out that in the absence of a defective product, Pfizer committed no tort by placing its name and logo on Insulag packaging. (*Id.* at 9.) In the absence of any relevant statutory history, such a reading is a reasonable interpretation of so broad a term as indirect liability.

The second element, that enjoinable suits "arise by reason of" Pfizer's ownership of Quigley, imposes a more demanding standard.[4] As noted, the Bankruptcy Court acknowledged

---

[3] Whether appellant would ultimately prevail on its apparent manufacturer claims if freed from the present injunction is far beyond the purview of this Court and irrelevant to its analysis of the proper scope of an injunction under § 524(g). *Manville III*, 517 F.3d at 68.

11

that "at first glance," Pfizer's alleged liability under § 400 arose out of its sponsorship of Insulag (*Id.* at 10).  Nevertheless, the Bankruptcy Court concluded that the term "arise by reason of" was ambiguous.  On the one hand, Pfizer would be held liable not because of its ownership of Quigley, but rather because it marked Insulag with its logo.  On the other, use of the logo seemed to the Bankruptcy Court to be merely an expression of corporate affiliation; that is, that Pfizer only placed its logo on Insulag advertising and packaging because it owned Quigley.  (*Id.* at 12.) The Bankruptcy Court noted this perceived ambiguity by resort to an analogy to the types of claims that both parties agreed arose by reason of ownership and could be enjoined through a § 524(g) channeling injunction:  claims alleging alter ego, successor-in-interest, and *respondeat superior*.  The Bankruptcy Court noted that as a general matter, a company would have to act fraudulently before it could be held liable under a theory of alter ego liability.  It would be incongruous, the Bankruptcy Court noted, if companies would be shielded when they acted fraudulently, but could be held liable for the relatively innocent act of placing a logo on packaging, at least where the use of the parent's  name and logo was merely "a statement of corporate affiliation."  (*Id.* at 12.)  In the court's view, "[i]f the corporate affiliation is the *sine qua non* of liability, the liability may be said to 'arise by reason of' the corporate relationship," a condition it held to be satisfied with respect to appellant's § 400 claims, thereby subjecting them to a channeling injunction.

      Respectfully, the Court believes that the Bankruptcy Court's analysis misapprehends the nature of § 400 liability.  Rather than being the *sine qua non* of liability, Pfizer's affiliation with Quigley was legally irrelevant to its sponsor liability.  In adopting § 400 liability, Pennsylvania

---

[4] The language of the statute makes clear that claims alleging that Pfizer, as parent, is "indirectly liable for the conduct of" its debtor-subsidiary are only subject to a channeling injunction "to the extent such liability arises by reason of . . . ownership." 11 U.S.C. § 524(g)(A)(ii).

courts sought to vindicate the expectations of the consumer which do not turn on the intent of a product's sponsor or its affiliation with a manufacturer. *Forry*, 237 A.2d at 599. The labeling at issue here first listed the Pfizer logo, followed by the Quigley logo, with the words "Manufacturers of Refractories—Insulations—Paints" beneath. (*See e.g.* RA 1020.) This label does not contain any mention of a parent-subsidiary relationship and could even be read as saying that Pfizer is primarily responsible for producing the product because Pfizer's name is listed first on the label. A reasonable consumer could believe that "the name and the trademark of [Pfizer], plus the reputation of [Pfizer], constitute an assurance to the user of the quality of the product." *Forry*, 237 A.2d at 599. Thus it appears that appellant here has stated § 400 claims against Pfizer that are legally independent of any factual issue as to the nature of its affiliation with Quigley or the reason why its name appears on Insulag packaging.

Further, the Second Circuit's analysis in *Manville III* teaches that this sort of legal analysis, rather than on inquiry into the factual circumstances that led to liability, is how courts should determine whether claims are derivative, arising by reason of a third party's relationship to a debtor, or whether they are independent of that relationship. Manville was at one time "the largest manufacturer of asbestos-containing products and the largest supplier of raw asbestos in the United States . . . ." *Manville III*, 517 F.3d at 55-56 (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 742 (E.D.N.Y. & Bankr. S.D.N.Y. 1991). Faced with a crushing number of products liability suits, Manville filed for Chapter 11 bankruptcy in 1982. *Id.* at 56. In response to the unique issues posed by asbestos litigation, the bankruptcy court oversaw what at the time was a new entity—an asbestos trust that would pay both present and future claimants. Travelers Insurance, Manville's "primary insurer from 1947 through 1976, paid nearly $80 million into the bankruptcy estate" that went to pay the claims against Manville that Travelers

had insured. *Id*. at 57. Later, many of those who were exposed to Manville asbestos separately sued Travelers. *Id*. at 58. Plaintiffs alleged that Travelers had learned of the risks of asbestos because it paid claims to asbestos sufferers in its role of Manville's insurer, and had defaulted on an independent duty to disclose to insured's its knowledge of asbestos hazards in violation of state insurance law. The bankruptcy court held, and the district court agreed, that these claims were precluded by a channeling injunction issued by the bankruptcy court, *id*. at 62, which barred all suits against Manville's insurers "arising out of" Manville's liability insurance policies, and required potential plaintiffs to seek redress from the asbestos trust instead, *id*. at 57.

The Second Circuit held that bankruptcy court did not have jurisdiction to bar claims by asbestosis suffers that proceeded directly against Travelers. Bankruptcy courts have broad equitable powers to release a company in bankruptcy from its debts and to reshape the company going forward. But the Second Circuit cautioned that courts should be hesitant to release third parties not in bankruptcy from claims against them because such third parties have not been subjected to the rigors of a bankruptcy proceeding. *Id*. at 66. The court also observed that the plaintiffs sought to recover not for the debtor Manville's conduct, but rather for Travelers' own alleged misconduct. *Id*. at 63. Further, the plaintiffs did not seek to recover insurance proceeds under Travelers' policies, which were the principle assets of the Manville estate. *Id*. Notably, the Second Circuit criticized the lower courts for viewing the inquiry as to whether these claims "arose out of" the Manville-Travelers relationship as essentially a factual one. *Id*. at 63. While in a literal sense the claims arose out of the insurance policies—but for the policies no claims would exist—a legal analysis was required under state law to determine whether Travelers had "an independent legal duty in dealing with the plaintiffs, notwithstanding the factual background in which they duty arose." *Id*. The court observed that § 524(g) channeling injunctions were

similarly "limited to 'situations where a third party has derivative liability for the claims against the debtor.'" *Id*. at 68 (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004). Ultimately, the court concluded that the district court lacked subject matter jurisdiction to enjoin the claims against Travelers because Travelers was alleged to owe a duty to plaintiffs independent of its obligations under the insurance policies. *Id*.

The Supreme Court reviewed this opinion in *Travelers Indem. Co. v. Bailey* and reversed on narrow procedural grounds. 129 S.Ct. 2195 (2009). The *Bailey* Court explicitly stated that in reversing, it "[did] not resolve whether a bankruptcy court . . . could properly enjoin claims against nondebtor insurers that are not derivative of the debtor's wrongdoing." *Id*. at 2207. The Second Circuit confirmed its analysis in *Manville III* on remand. *Manville IV*, 600 F.3d at 158. It confirmed that courts did not have the subject matter jurisdiction in bankruptcy cases to enjoin non-derivative claims against third parties and that § 524(g) likewise limited the scope of a channeling injunction to derivative claims. *Id*. at 153. Applying the Circuit's holding in the *Manville* cases, this Court must determine whether as a matter of law, rather than merely as a matter of fact, Pfizer's liability is derivative of Quigley's. Put another way, does Pfizer's liability under state law arise out of its ownership of Quigley, or does liability arise out of its independent obligations as a sponsor of Insulag?

One way to answer this question is to propose the following hypothetical: Assuming that Pfizer had no corporate affiliation with Quigley could it be liable under § 400 if Insulag were marketed with Pfizer's logo on the packaging (say, as its disbritutor)? Since the answer is obviously yes, it would appear that Pfizer's liability arises out of its sponsorship of a defective product, not its corporate affiliation (or, in the hypothetical, its distribution agreement) with the manufacturer.

15

The Bankruptcy Court reached the opposite conclusion by employing a sort of commutative reasoning:  § 400 liability is treated as a kind of vicarious liability under Pennsylvania law (BR Opinion at 8 (citing *Waters v. NMC-Wollard, Inc.*, 2007 WL 2668008, at *7 (E.D. Pa. Sept. 5, 2007))), and vicarious liability claims are considered derivative under state law (*id*. citing *Mamalis v. Atlas Van Lines, Inc.*, 560 A.2d 1380, 1383 (Pa. 1989)), so § 400 claims are derivative under *Manville III and IV* and properly enjoinable pursuant to § 524(g) (*id*. at 14).  One difficulty within this analysis, however, is that the labels "derivative," and "vicarious" describe overlapping and amorphous concepts.  The Second Circuit counseled in *Manville III* that courts should look beyond facile labels and examine the underlying nature of each claim.

These labels become especially confusing in the context of strict products liability claims.  Appellant argues that Pfizer should be directly liable under § 400 which section imposes "the same liability as though he were [a] manufacturer" under § 402A.  Pursuant to § 402A, liability attaches to a seller of a defective product "although the seller has exercised all possible care in the preparation and sale of his product."  Restatement (Second) of Torts § 402A(2)(a).  Two of the justifications for this rule are

> that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

*Id*. cmt. c.  In other words, all parties in the distribution chain are held strictly liable for selling a defective product not because they acted culpably, but rather because they defaulted on a duty to sell a safe product and are judged to be in a better position to bear the cost than the consumer.

Section 400 liability reads another entity into the distribution chain: the company that did not manufacturer a product, but held itself out as a sponsor. Any participant in the distribution chain could be said to be held vicariously liable for the conduct of the original manufacturer. Yet in another sense, each of these participants had an independent responsibility to the consumer not to market or sell a defective product, and each can be held liable if it defaults on that responsibility.

Although the § 402A claims against Quigley are closely related to the § 400 claims against Pfizer, they are not the same. A claimant under each theory seeks redress for injury caused by a defective product. But the mere fact that claimants seek redress for the same ultimate harm does not mean that the one claim is derivative of the other, as that term is used in *Johns-Manville III and IV*. Pursuant to a § 400 theory, appellant in effect argues that claimants have been injured because they (or the actual purchaser) relied upon Pfizer's reputation in deciding to use a defective product. Appellant thus seeks to bring separate direct actions against Pfizer for the harm claimants suffered because Pfizer breached an independent legal duty not to employ its name and logo in the marketing of a defective product. Because these claims do not legally arise by reason of Pfizer's ownership of Quigley, they are beyond the proper scope of a § 524 channeling injunction and beyond the jurisdiction of a bankruptcy court.

The Bankruptcy Court concluded that § 400 liability must be a type of claim that arises by reason of ownership because other claims based on ownership, such as piercing the corporate veil, are enjoinable but require that the parent company has acted fraudulently before liability will attach. It would make "no sense" the court reasoned to exclude a § 400 claim which "pales in comparison to the wrongful conduct" required to impose liability under an alter-ego theory. (BR Opinion at 12.) But this argument fails to take into account key differences between § 400

17

liability and forms of liability similar to piercing the corporate veil. The Pennsylvania Supreme Court has described the justification for piercing the corporate veil as follows:

> [The] legal fiction of a separate corporate entity was designed to serve convenience and justice, and will be disregarded whenever justice or public policy demand and when the rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless. We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

*Ashley v. Ashley*, 482 Pa. 228, 237 (1978) (internal citations omitted). In other words, "[w]here the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity; therefore, its acts are truly his." *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 621 (1983). It is natural, then, that a plaintiff who seeks to pierce the corporate veil would have to show some form of fraudulent behavior, whereas plaintiffs who allege § 400 liability should be required to make a different or even less burdensome showing. The crux of this analysis is not whether the predicate acts for one cause of action are better or worse, but rather whether those claims derive as a legal matter from Pfizer's ownership of Quigley.

A careful comparison of enjoinable claims like piercing the corporate veil and *respondeat superior* to § 400 liability reveals important differences between the types of claims. Were appellant seeking to pierce the corporate veil, it would argue that Quigley's actions were, in effect, Pfizer's actions. Were it seeking to hold Pfizer liable under a theory of respondeat superior, it would argue that Quigley's actions should be attributable to Pfizer because of the legal relationship between the two. Neither theory is a legal claim in itself, but rather a method of determining who should be responsible for an injury. Furthermore, in each of these hypotheticals, appellant would not be able to hold Pfizer liable unless it demonstrated a relationship between Pfizer and Quigley. Corporate affiliation is indeed the *sine qua non* of

these forms of liability. But for a § 400 claim, it is legally irrelevant that Pfizer owned Quigley. Section 400 claims often involve two companies that are not linked by any kind of corporate affiliation. Rather, one company might purchase a product from another company and label that product as its own. *See, e.g.*, *Walton*, 610 A.2d 454. When one examines the nature of the legal claim, as opposed to merely the factual circumstances that gave rise to the claim, it becomes apparent that the claim itself does not arise from Pfizer's ownership of Quigley, and so § 524(g) does not authorize an injunction.

Pfizer, perhaps recognizing the weakness of its analysis, contends that an injunction is warranted because Quigley's *res* is exposed to claims by Pfizer for indemnification. The Bankruptcy Court appears to have credited this argument. (BR Opinion 14.) But Pfizer's ultimate ability to seek indemnification cannot alone confer subject matter jurisdiction. In the seminal case of *Pacor, Inc. v. Higgins*, the Third Circuit held that the bankruptcy court did not have jurisdiction to hear claims against a company that had distributed asbestos manufactured by Johns-Manville merely because the outcome of these claims could ultimately affect the *res* of the Johns-Manville estate. 743 F.2d 984, 995 (3d Cir. 1984). It reasoned that the suit was "[a]t best . . a mere precursor to the potential third party claim for indemnification by Pacor against Manville" and held that the proceeding itself would have to directly affect the *res* of the estate for jurisdiction to be appropriate. *Id*. *Pacor* is entirely on point. The § 400 claims that appellant wishes to prosecute are legally almost identical to the claims against asbestos distributors in *Pacor*.

Pfizer is on marginally firmer footing in arguing that appellant's claims will directly affect the *res* because Pfizer and Quigley share an insurance policy to defend asbestos claims. In *In re Combustion Eng'g, Inc.*, two subsidiaries of the same parent had shared insurance, one of

which was in bankruptcy, and the non-debtor subsidiary argued that the shared insurance acted as an indemnity agreement, conferring jurisdiction on the bankruptcy court. 391 F.3d 190, 232 (3d Cir. 2004). The Third Circuit noted that "it is doubtful whether shared insurance would be sufficient grounds upon which to find related-to jurisdiction over independent claims against" the non-debtor subsidiaries, but ultimately found that it had insufficient facts to decide the issue and ruled on different grounds. *Id.* at 233. The Third Circuit did not decide the issue definitively, however, and it is possible that the fact a parent-subsidiary relationship exists would affect the Third Circuit's analysis. Nonetheless, even if the Court were to hold that these claims would directly affect the *res*, this fact would only have bearing on the subject matter jurisdiction analysis. It would not affect the Court's holding that the appellant's § 400 claims do not arise out of Pfizer's ownership of Quigley and, therefore, do not fall within the scope of § 524(g).

## CONCLUSION

For the foregoing reasons, the ruling of the Bankruptcy Court is REVERSED. Appellant is free to pursue its § 400 claims in Pennsylvania state courts.

SO ORDERED.

Dated: New York, New York
       May 17, 2011

_____
Richard J. Holwell
United Stated District Judge